UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT


UNITED STATES OF AMERICA )

                            )

              v. )     CASE NO. 2:12-cr-0091

                            )

MICHAEL FORESTE       )


<u>ORDER</u>

Defendant Michael Foreste is charged with knowingly and intentionally possessing with the intent to distribute a mixture or substance containing a detectible amount of Oxycodone, a Schedule I controlled substance. Foreste filed a motion to suppress evidence seized from his person in a search incident to arrest, asserting that he was subject to an unreasonable investigatory detention and a subsequent *de facto* arrest. For the reasons stated below, the Court denies the motion to suppress.

## I.   Factual Background

On April 2, 2012, Michael Foreste was a passenger in a rental car driven by Telly Cesar traveling north on I-91 in Massachusetts when Trooper Rachel Loiselle of the Massachusetts State Police pulled the vehicle over for speeding. Loiselle

1

testified that she initially became suspicious of Foreste and Cesar when she asked Cesar for his license and registration. Cesar mumbled his response, and when she asked Cesar to repeat himself, Foreste answered for him. Foreste then explained the details of their trip without being asked by either Loiselle or the trainee trooper working with her. Foreste's "overly communicative" behavior struck Loiselle as "odd." Tr. 75.

Loiselle contacted Sergeant Eric Albright of the Vermont State Police to request information on Foreste because he is a Vermont resident and the rental car was registered in his name. Foreste gave Loiselle a rental agreement for the vehicle which was over a month past its expiration date. Loiselle contacted dispatch and asked the officer to investigate the agreement with the rental car company. While waiting for the results of the call, Loiselle returned to the vehicle to explain the reason for the delay. Foreste then gave her another rental agreement with a more recent expiration date. The car rental company informed the dispatch officer that the rental agreements were fine as long as the car was eventually returned. The trainee trooper Loiselle issued a citation for speeding and Loiselle released the car before Albright called back.

Albright contacted Detective Dan Merchand with the Burlington Police Department to get more information about Foreste after Loiselle called. Merchand told Albright that

according to a confidential informant Foreste was a "kilogram level cocaine and Oxycontin dealer in the Burlington area." Gov't's Opp'n to Mot. to Suppress 1, ECF No. 20 [hereinafter Gov't Mot.]. Albright then called Inspector Mark Heberts from the Vermont Department of Motor Vehicles. Heberts is a canine handler who works with narcotics certified canine named Corrie. Albright asked Heberts to "start to head in [Albright's] direction" so that he would be "prepar[ed] to have whatever tools [he] might deem necessary in the course of an investigation like this at roadside." Tr. 11, ECF No. 31. Albright also called Special Agent Thomas Doud of the Drug Enforcement Administration to "see if he had any information on [Foreste or Cesar]" because Merchand was investigating Foreste "in conjunction with Special Agent Doud." Albright was unable to reach Doud and left him a voice mail. Albright then drove toward I-91 near Guilford expecting to encounter Foreste.

Albright observed Foreste's vehicle roll through a stop sign while exiting the parking lot of the Welcome Center in Guilford. Albright followed the vehicle onto I-91. He then noticed "an item hanging off of the rearview mirror…."[1] Albright stopped the vehicle at approximately 1:40 p.m. after following

---

[1] Vermont law provides that "[n]o person shall…hang any object, other than a rear view mirror, in back of the windshield" subject to six exceptions that do not apply here. 21 V.S.A. § 1125 (a) (2005).

the vehicle for one to two miles. Albright approached the vehicle on the passenger side and spoke to Cesar and Foreste.[2] Cesar provided his driver's license and Foreste provided the rental agreement for the vehicle.  Albright noticed that Cesar's "speech was somewhat mumbled and difficult to hear." Tr. 17. He also "observed what [he] believed to be marijuana chafe or material on Mr. Cesar's lap, in the groin area of his pants." Tr. 17. Albright "ordered [Cesar]from the car to further investigate whether or not he was in possession of narcotics and/or under the influence and operating the vehicle as such at that point." Tr. 19.

Cesar and Albright "step[ped] to the rear of the car" where Albright asked Cesar if he had anything that could hurt Albright. Tr. 20. Cesar stated that he did not. Tr. 20. Albright and Cesar then sat in the front seat of Albright's vehicle while Albright checked Cesar's license, looked at the rental agreement, and checked for warrants. Tr. 20. Albright asked Cesar about his trip, and Cesar told him that he and Foreste were traveling "from the area of Valley Stream, New York" to Bristol, Vermont. Tr. 20. Albright gave Cesar a written warning for the failure to stop at the stop sign and the obstructed

[2] Albright testified that it is his practice to approach vehicles on the passenger side so that he does not have to "worry so much about oncoming traffic and can focus on any type of danger or threat that could be posed by…the vehicle or its occupants." Tr. 16.

4

windshield violation. Cesar gave Albright permission to speak with Foreste, and Albright and Cesar exited the police car. Tr. 20.

Albright spoke with Foreste about his trip with Cesar. Foreste "also indicated that they were coming from the Long Island area." Tr. 23. Albright "explained to [Foreste] that [he] saw what [he] believed to be marijuana on Mr. Cesar's lap" and asked Foreste if Cesar "possessed some marijuana in the car or had been smoking earlier." Tr. 23. Foreste told Albright that "there was absolutely no way that he did or that he had been." Tr. 23.  At 1:52 p.m., Albright asked Foreste for consent to search the vehicle and he refused. After Foreste denied consent, they "were kind of in a holding pattern" because Albright was waiting for Inspector Heberts to arrive. Tr. 25. At that time, Foreste began to exhibit "some physical changes" indicating nervousness. Tr. 23. Albright also noticed "a white residue on the hairs and membrane inside [Foreste's] nostrils consistent with…having ingested narcotics nasally." Tr. 35. Albright spoke to Agent Doud at 1:54 p.m. Doud told Albright that "he had information that Mr. Foreste was involved in cocaine and Oxycontin distribution in the Burlington area." Tr. 25. Doud also told Albright that narcotics canines had positively alerted to the odor of narcotics on three rental cars returned by Foreste in the past few months.  Tr. 25. After speaking with

Doud, Albright informed Foreste that a narcotics canine was on its way.

Heberts arrived at 2:18 p.m. Heberts and Corrie "perform[ed] an exterior scan of the vehicle." Tr. 28. Heberts told Albright that Corrie had "alerted to the presence of narcotics odors coming from the vehicle." Tr. 28. According to Heberts's affidavit, Corrie alerted to a number of locations on the vehicle, including the passenger window where Foreste was seated. Gov't Ex. 2. Albright again requested consent to search the vehicle, and Foreste again refused. Albright asked Foreste to "exit the vehicle for the purposes of securing the vehicle for the warrant application." Tr. 28. Albright asked for consent to search Foreste's person, which was denied. At that point, Albright "detained him in handcuffs for the purpose of applying for a search warrant for his person as well." Tr. 28.

Albright detained Foreste and Cesar in separate holding cells at the state police barracks for approximately four hours while waiting for the search warrant to issue. Def.'s Mot. to Suppress 3, ECF No. 16 [hereinafter Def.'s Mot.]. Foreste was handcuffed to the wall of the cell and monitored via video surveillance. Tr. 63. The search warrant was issued at 6:05 p.m. Tr. 38. Albright commenced a search of the vehicle at 6:20 p.m. and found "prescription drugs that were not in their designated container." Def.'s Mot. at 3. The prescription drugs

were in a pill bottle bearing Foreste's name. Def's Mot. at 3.
Albright called Detective Merchand again and "asked him if there
was any other information about where Mr. Foreste hid any
narcotics." Tr. 45. Merchand "checked with his informant" and
called Albright back to tell him that Foreste "frequently" hid
the narcotics "taped to his legs or his thighs." Tr. 45.
Albright "officially" arrested Foreste and searched him incident
to the arrest between 6:50 and 7:00 p.m. Albright found two bags
containing approximately 654 Oxycodone pills "in [Foreste's]
boxer briefs." Tr. 45.

## II.  Reliability of Canine Alert

After the suppression hearing, the Supreme Court issued its
decision in *Florida v. Harris*, 133 S.Ct 1050 (Feb. 19, 2013),
which established the appropriate standard for determining
whether a positive alert by a canine during a traffic stop
provides probable cause to search a vehicle. Under *Florida v.
Harris*, a court should find probable cause to search when the
State "produce[s] proof from controlled settings that a dog
performs reliably in detecting drugs" and the defendant does not
contest the State's showing. 133 S.Ct at 1058. The Court stated
that a defendant "must have an opportunity to challenge such
evidence of a dog's reliability, whether by cross-examining the
testifying officer or by introducing his own fact or expert
witnesses." *Id.* at 1057.

In *Harris*, the State established the canine's reliability by presenting evidence that the canine had "successfully completed two recent drug-detection courses and maintained his proficiency through weekly training exercises." *Id.* at 1058. On cross-examination, the defendant focused on the canine's field performance. In particular, the defendant challenged the search of his vehicle because none of the drugs that the canine was trained to detect were found in the vehicle. The Court held that the defendant did not rebut the State's evidence because the failure of a particular alert to lead to drugs is not a reliable indicator of a canine's overall dependability.[3]

In his post-hearing memorandum, Foreste challenged the reliability of Corrie's alert based on *Florida v. Harris*. This Court conducted an evidentiary hearing on Corrie's training and

---

[3] The Court explained:

> [I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Harris*, 133 S.Ct. at 1056–57.

qualifications on April 18, 2013 to allow the defendant to examine Inspector Heberts. Heberts provided Corrie's training records and testified about her performance in controlled settings. He testified that Corrie participates in 16 hours of training every month and is recertified annually. The evidence substantiates the canine's reliability.

### III. Discussion

Foreste seeks to suppress the Oxycodone pills. There are three issues before the court: (1) whether the duration of the detention was unreasonable under the circumstances; (2) whether, and if so when, Foreste was subject to *de facto* arrest; and (3) if he was subject to *de facto* arrest, whether there was probable cause at that time to formally arrest him.

At the suppression hearing, the Court requested supplemental briefing on whether, if Foreste was *de facto* arrested without probable cause, the discovery of the prescription pills precluded application of the exclusionary rule to the narcotics discovered on Foreste's person. Because the Court finds that there was probable cause to arrest, the exclusionary question is not addressed here.

### A. Initial Detention

The Fourth Amendment protects the right of individuals to be free from unreasonable searches and seizures. When a police officer stops a vehicle for a traffic infraction, all occupants

of the vehicle are seized for Fourth Amendment purposes. *Brendlin v. California*, 551 U.S. 249, 249 (2007). Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred. *Id.* If an officer has observed a traffic violation, his or her subjective motivations for stopping the vehicle are immaterial in considering whether the traffic stop was constitutionally reasonable. *Id.* at 813. An officer may lawfully order the driver out of the vehicle, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), and question the occupants about matters unrelated to the stop, as long as the inquiries do not unreasonably protract the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts. *See United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992).

The decision to stop the vehicle was reasonable because Albright had probable cause to believe that Cesar had violated 23 V.S.A § 1048 (failure to stop) and 23 V.S.A. § 1125 (obstructed windshield). Albright lawfully ordered Cesar out of the vehicle and questioned him for a limited amount of time while completing his enforcement action. Albright then returned to the vehicle to speak to Foreste.

While speaking with Foreste, Albright noticed white residue in Foreste's nostrils and physical manifestations of nervousness. Tr. 24. Albright's observations and the information he had already learned from Merchand yielded a reasonable suspicion of criminal activity that justified expanding the stop into an investigatory detention. *United States v. Oates*, 560 F.2d 45, 59-60 (2d Cir. 1977) ("[A] police officer's knowledge of a person's reputation as a prominent narcotics trafficker can properly be considered, along with other factors, as an element justifying the officer's reasonable suspicion….").

## B. Duration of Detention

Foreste argues that the investigatory detention lasted for an unreasonable amount of time. He asserts that the relevant time period should include both traffic stops because the stops were "for a single purpose by two officers working together." Def.'s Post-Hr'g Mem. 4, ECF No. 32. As stated above, an officer's subjective intentions for stopping a vehicle are irrelevant and a stop is presumptively reasonable if the officer has observed a traffic violation. Both Loiselle and Albright observed traffic violations prior to stopping the vehicle. Whether Loiselle and Albright were "working together" is immaterial because each had probable cause to stop the vehicle after observing separate traffic infractions. *See Whren*, 517 U.S. at 813. The duration of the first stop is not relevant to

the detention by Sergeant Albright. Rather, the relevant time period is the 40 minutes that passed from the time that Albright stopped the vehicle (1:40 p.m.) until the time that Foreste was handcuffed (approximately 2:20 p.m.).[4]

In determining whether an investigative stop lasted for an unreasonable length of time, the court "examine[s] whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The Supreme Court has permitted an investigative stop lasting 20 minutes when the officer spent the time obtaining local police assistance, questioning the driver, and examining the exterior of the vehicle. *Id.* at 687 (considering a stop of two vehicles suspected of transporting marijuana by a DEA agent and a highway patrol officer where the officer stopped the vehicle containing the marijuana and had to wait for the DEA agent to arrive from the other vehicle). The Fourth Circuit has held that a 55-minute detention pending arrival of canines was reasonable when the officer requested the canine narcotics unit "shortly after" deciding to detain the vehicles in question. *United States v. McBride*, 676 F.3d 385, 394 (4th Cir. 2012)

---

[4] The investigatory detention became a *de facto* arrest when Foreste was handcuffed. See subsection C below.

(considering detention of vehicles outside a nightclub where officers had observed suspicious activity). Similarly, the Eleventh Circuit approved of a traffic stop lasting over an hour due to the time it took for a canine unit to arrive after the occupants denied consent to search the vehicle. *United States v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (stating that the investigation was diligent because the officer requested the canine unit "immediately upon deciding that a canine sniff was appropriate").

The detention in this case lasted for a shorter amount of time than those upheld by the Fourth and Eleventh Circuits in the cases cited above. Unlike the officers in those cases, however, Albright requested a canine unit prior to stopping the vehicle, as opposed to after the traffic stop began. By doing so, he minimized the time that he detained Foreste and Cesar while waiting for the canine to arrive. Heberts informed Albright that Corrie had alerted to the odor of narcotics coming from the vehicle only one to two minutes after arriving. Albright was diligent in requesting the canine and the investigation confirmed his suspicions quickly. Accordingly, the 40-minute detention was reasonable under the circumstances and did not transform the investigatory detention into an arrest.

C. Use of Restraint

The use of excessive restraint may transform an investigatory stop into a *de facto* arrest. *United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982). In general, an officer is not permitted to draw a weapon or use handcuffs during an investigatory stop unless he or she is responding to legitimate safety concerns. *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004). When "police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (citing *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)) ("[T]here was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop.").

The traffic stop became an arrest when Albright handcuffed Foreste. Albright's interactions with Foreste involved no verbal or physical threat of violence, and none of the information from Merchand or Doud indicated that Foreste was known to be violent or carry weapons. Handcuffs were an unnecessary restraint because Albright's safety was not threatened. Therefore, the use of handcuffs transformed the investigatory detention into a *de facto* arrest requiring probable cause.

## D. Probable Cause to Arrest

Probable cause exists if, at the time of the arrest, the officer is aware of facts and circumstances that warrant a belief that the individual had committed or was committing an offense. *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). "In examining whether probable cause existed, the court considers the totality of related facts and circumstances at the time of arrest from the perspective of a reasonable police officer." *United States v. Williams*, No. 2:11-CR-140, 2012 WL 2862227, at *4 (D. Vt. July 10, 2012) (citing *United States v. Delossantos*, 536 F.3d 155, 159 (2d. Cir. 2008)).

The facts and circumstances known to Albright when he handcuffed Foreste include (1) information from Merchand's informant that Foreste "travels to the New York City area in rental cars and brings…narcotics back to Burlington for distribution", Gov't Ex. 2; (2) white residue in Foreste's nostrils,[5] Tr. 35; (3) Foreste's nervous behavior, Tr. 24; (4) Doud's statement that he had recently facilitated investigations with narcotics canines of rental car returns by Foreste that had resulted in positive alerts for narcotics; and (5) statement by Inspector Heberts "that his K-9 had alerted to the presence of narcotic odors coming from the vehicle" Tr. 28, and in

---

[5] Although there is no physical evidence to corroborate Albright's observation of the white residue, there is no reason to discount his credibility regarding the observation.

particular, the K-9 alerted to the front of the passenger window.

Foreste argues that the information from Merchand's informant cannot form a basis for probable cause because it lacked the necessary indicia of reliability. Def.'s Post-Hr'g Mem. 12, ECF No. 32. According to Foreste, the "CI's information cannot be distinguished from mere rumor or unsubstantiated hearsay on this record" because Merchand did not provide any information about the informant or the informant's basis of knowledge. *Id.*

While Foreste is correct that the court has no information about the informant's basis of knowledge or track record, the tip is reliable because it is corroborated by the circumstances of the stop and Doud's prior investigations. *Williams*, 2012 WL 2862227, at *5 (citing *Illinois v. Gates*, 462 U.S. 213, 233–34 (1983); *Draper v. United States*, 358 U.S. 307, 313–14 (1959)) ("A tip from an informant can constitute reasonably trustworthy information on which to base probable cause, when corroborated by the independent observations of law enforcement."). The informant told Merchand that Foreste brings narcotics to Burlington from New York in rental cars. At the time of the stop, Foreste was traveling in a rental car. He and Cesar told Albright that they were heading toward Bristol, Vermont from the New York City area. Albright observed white residue consistent

with snorting narcotics in Foreste's nose, and a trained narcotics canine positively alerted to the vehicle. The information was further corroborated by Doud's investigations of rental cars associated with Foreste. The consistencies between the informant's information, the traffic stop, and Doud's investigations establish the informant's reliability.

Under the totality of the circumstances—the canine alert, the information from Doud, Merchand, and the informant, and the fact that Foreste was traveling in a rental car from the city believed to be his source for narcotics—there was probable cause to believe that Foreste was committing a narcotics-related offense. Therefore, the *de facto* arrest did not violate Foreste's Fourth Amendment rights because probable cause to arrest existed at that time.

### III. Conclusion

For the reasons stated above, the Court denies Foreste's Motion to Suppress.

DATED at Burlington, Vermont, this 7th day of May, 2013.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge